May it please the Court, my name is Christopher Bowman. I'm from Yeager and Yumbauer on behalf of the Plaintiff Appellant Thomas Kuduk. This case arises under the whistleblower protections of the Federal Rail Safety Act and relevant to this appeal in order to withstand a railroad's defendant's motion for summary judgment. Plaintiff has to present a prima facie case of in essence three elements. First, existence of a protected activity. Second, that the railroad had knowledge of that protected activity. And finally, that the protected activity tended in any way was a contributing factor toward some adverse action. Unless the Court has any specific questions on the first section of the brief on whether or not the the banner test on May 17th constituted a protected activity, I'd like to focus on the second too. He didn't like the way Mr. James had conducted the test. I don't see a reference to a safety rule in that. He thought that the test had been What safety rule are we talking about? I see nothing safety-wise in the form of protected activity in that. The protected activity... It wasn't fair. I wasn't fairly judged because or actually he passed the test so I don't know what he was I don't know what he was doing other than just... He did pass... He did pass the banner test but his belief was Mr. Kuduk had a good faith belief that that the test had been done improperly and the way we get to the safety rule or safety violation, excuse me, is that the banner test is conducted pursuant to various safety regulations that govern the railroad and... Did he cite to the union representative what safety rule was violated? I don't believe... By not unfurling the banner sufficiently?  That wasn't a safety complaint. That was a fairness complaint. With all respect to the court, I would respectfully disagree that it's that an improper banner test conduct... Any complaint about a test that exists for initially for safety reasons is automatically protected a safety complaint. I just think that's not at all clear and that I would probably have upheld a decision that that wasn't protected. It's a matter of fact though the district court went on and presumed protected activity, right? Correct. This decision is based on the fact that the subsequent serious safety violation by Mr. Kuduk, which unfortunately led to his termination, was completely after and unrelated to any arguable protected activity, right? That's the guts of the case. That's the central question or one of the central questions of the case. I don't understand how you can get around that analysis. I think where the response to that comes in is we take issue with the district court determining at the summary judgment stage that there was in fact a second serious safety violation that occurred here. The allegation is that... I read the brief and it goes on and on about how it was unfair to consider this fouling of the tracks a serious safety issue, but isn't it undisputed that he quote fouled the tracks by walking between the rails? It is undisputed that he walked between the rails for I believe a total of three car lengths. The central issue though is fouling the tracks in and of itself is not a safety violation. It's not one of the deadly decisions and it's not against the rules. What the rules prohibit is fouling the tracks, which is a term of art in the railroad industry, meaning walking between the rails or in close enough proximity to the rails without ensuring proper protection, without ensuring that there's no movement except for when duty is required. There's the deadly decision and the TY&E safety rule, which in essence say the same thing. You can't walk between the rails unless you're... You just want the courts to be what we refer to as a super personnel department. I mean there's no question that he fouled the tracks as BNSF construes its eight deadly decisions and therefore they are privileged, however unfair, to take enforcement or disciplinary action that they consistently apply. And I don't see where arguing about it wasn't fair here does anything other than ask us to second guess a business decision. And I think that your honor's point would be, may in fact be fatal to the case if, and this is the big if, if a legitimate business decision was a defense under the FRSA and the Department of Labor through the ALJ and the ARB and the various federal courts that have addressed the question, and I'll be the first to admit there haven't been very many since the FRSA has been amended, show that a legitimate business decision is not a defense under the statute. If we were under McDonnell Douglas, we'd be having a much different conversation today and, excuse me, I'll leave it to... Not even Araujo said that. Not even Araujo said... There's no legitimate business defense. But what it said is that it's not enough to show that the railroad could have taken the same adverse action, in this case terminating Mr. Kuduk's employment, it has to show conclusively that it would have done that and I believe, personally I believe that the facts indicate that it does not show that. At the very least I think there's enough evidence for this case to get to a jury on that question. Let me see if I can understand what... Here's the way I interpreted your brief. The union supervisor, what was his name? That raised the banner test to the... The banner guy, the guy who was shaking the banner, shaking the flag. Greg Jabe was the individual that was waving the banner and Mike Wald was the one that raised the concern. He was the union representative. Correct. The supervisor was there when that issue was raised. Of course it was held, it was determined, it was not a safety violation. But there might be some claim that there was animus on the part of the labor guy, the union person, because he was attacked by... his work was attacked. And then the same labor guy, same union representative, is the one who reported him for walking between the tracks. Isn't that right? That's correct. The supervisor who does the actual discharge was present when the flag issue was raised And then when he got the further notice from the union person who saw him violating the rule about walking between the tracks, it was the same fellow and the same supervisor. So now you're taking the leap, really, and saying that's enough to show that the reasons given might have been something to do with a safety violation, so we should at least, under the new changes in law, get to the jury. That's your position, isn't it? In essence, I believe it's myself, a paladin in this case, as well as the ARB, saying that the temporal proximity, indications of pretext, falsity of the employer's reasons, all of this is enough to establish, at the very least, a prima facie case sufficient to allow a jury to... The judge presumed a prima facie case. The question was, that I understand, is you're claiming that you had enough to show pretext. Is that right or am I wrong? Pretext in regard to which set of the test. I'm afraid I don't understand the court's question. Well, I'm asking you. I thought that was your position, that the reason you get to the jury is you had a prima facie case, and you had enough to show that the reason for firing him, walking between the tracks, which was illegal, improper, unless there were certain circumstances, was enough to raise the question of whether there was retaliation because he had tried to raise a safety issue. If I understand the court's question correctly, and I think now I do, evidence of retaliation or retaliatory animus isn't necessary in these FRSA cases. This is separate and distinct, to borrow the language from the Third Circuit, from the McDonnell-Douglas, where evidence of retaliation, retaliatory motive, animus on behalf of the employer is a necessary element. The prima facie case is enough? A prima facie case and the railroad not having met its steep, complex, heavy burden of showing that when the evidence is viewed in the light most favorable to Mr. Kuduk, that clear and convincing evidence shows that they would have taken this exact same determination, even if there had been no protective activity, whether we're including the banner test in that or not. I think it's at least enough to get us to a jury. Is there any evidence? You're not saying that pretext isn't involved anymore, are you? The road gives a good reason and you don't have to show that it's a pretext or have some evidence to show pretext? Is that your position? I don't believe it's necessary to show pretext. That's the way I read your briefs. I think there is evidence of pretext here, namely the fact that everything from Mr. Jabe's complaint and his testimony at the investigation hearing to the railroad's decision and, unfortunately, to the district court's analysis reads out the exception to the following the tracts prohibition. Is there any evidence that Jabe knew that he had taken the safety precautions necessary for walking between the tracks at the time he made the report? At the time he made the report? Which report? That he was walking between the tracks. I believe that the record shows that Mr. Kuduk stated that it was the safest place to walk and that protections had been made. In any event, neither Jabe nor Mattson took it upon themselves to investigate. There is no investigation about whether or not the numerous protections that were taken and are outlined in the brief were, in fact, taken. I'm not sure whether Jabe knew about the protected activity at the time of the discipline. No, my question was whether Jabe knew that he took the necessary, he alleges he took these necessary safety precautions before he walked between the tracks. Did Jabe know that at the time he made the report? I believe so, yes, Your Honor. Where's the evidence? Where can I find that evidence? And then my follow-up is, is there evidence that Ebel knew at the time he made the decision that he had taken these necessary safety precautions before walking between the tracks? I know the necessary safety precautions were brought up throughout the investigative hearing, and I believe, I don't have the citation in front of me right now, but that Jabe acknowledges that when he and Mr. Mattson first approached Mr. Kuduk, he informed them that he was on his way to pick up a FRED, an end-of-terrain device, and that it was the only safe place to walk and that he was required to walk there. Yeah, but that's not enough. He's got to take more safety precautions than saying that this is the safest place to walk. And I think the record shows that in any event, there's at the very least a question of fact, when the evidence is viewed in the light most favorable to Mr. Kuduk, that a jury could find that those safety precautions were taken. I don't understand where any of this refutes the showing, even if it requires clear and convincing evidence that the BSS consistently applied to Mr. Kuduk a disciplinary rule that it consistently applied to others because it considers it one of the eight deadly decisions. But again, walking between the rails is only one of the eight deadly decisions if you don't read the exception, if you read the exception out of the rule. They get to read their rule. You're trying to link the decision based on the fact that you think your client thought it was unfair to create evidence of retaliation, to whistleblow. You can't do that. I don't care what the standard is. With all respect, it sounds like we have a disagreement on that, but there's... I don't see any case that goes there. That goes to... That gets where you want to go, even if you have a prima facie case. I see that... I'm not raising an inference to refute the employer's application, consistent application, a rule that produced a harsh adverse action. I see that my time has expired. May I respond? In the case that you read Araujo, what else do I read? I think Araujo and the ARB's decision in Rudolph get us there, and the fact that... And again, and I apologize to keep coming back to this point, Mr. Kudyk simply did not commit one of the deadly decisions, or at the very least there's a dispute of fact as to whether or not he did. You'll have to apologize for sticking to your gut. Thank you, Your Honor. Mr. Douglas? May it please the Court, Counsel, I think the Court has seized upon the central issue, and I won't belabor the point except to say just a couple of points, if I may, Your Honors. First, that the evidence in the record is uncontroverted, and it's acknowledged that Thomas Kudyk followed the tracks on June 9, 2010. That at the time that he did that, he was already on probation for a prior serious violation, which in the language at BNSF is called a Level S violation. He had accepted responsibility for a train car derailment about six months earlier and signed a waiver, and what that means in the railroad operation, he accepted responsibility for that event and chose not to have an investigative hearing. He was then given, I believe, a record suspension, which is a suspension, but you keep working because of manpower needs, so it goes on your record. And you get a 12-month probationary period with that. The notice that you get is explicit. It says if you violate any more rules within the next 12 months, you're subject to further discipline and discharge. Is that what I wanted to ask you about? Yes, Your Honor. I have a question in my mind about the violation of the rule in walking between the tracks and what we look at. When his attention was called by the two people, two train men, including this one union fellow, that he was walking between the tracks, that he yelled at him several times, then he finally got off, and then they said, you've been walking between the tracks since, following the tracks, not determining, something like that. And he argued with them, and they put that in as a violation. But during the hearings, it's not until the hearings that he puts in evidence that there was no violation. And from the standpoint of when he was discharged, the only thing that's in the record for the supervisor was the discussion and argument that they had at the time he got off the tracks. Is that right? Am I right in that analysis? I think close, Your Honor, but not entirely, if I may respond to that. Well, I want to know. I'm not clear whether there was or wasn't a violation and how it affects this case. So if you can help me on that area, you'll maybe help the decision. I will be happy to, Your Honor. Essentially, the appellant in this case is asking the court to ignore one half, or the most important part, if you will, of the do-not-follow-the-tracks rule. The do-not-follow-the-tracks rule, obviously, is a safety rule. It's there for a good reason. It is a very dangerous place to be, walking on the tracks. But the first element, the first prerequisite for following the track is that it must be necessary to perform a duty. Necessary to perform a duty. And the other aspect of that is you must make sure that there is protection against movement of trains or equipment on the track. Mr. Kudyk, at the time he was found by the two supervisors, and I would just make one brief correction, Your Honor, neither one of those gentlemen were union people. They were management people. Neither of the two witnesses who found Mr. Kudyk on the tracks on June 9th were union people. They were supervisors of the railroad. They were trainmasters that happened to be doing operations testing up near Hinkley that day. Was one of them involved with the flag issue? Yes. It turned out, by chance, Mr. Jabe was one of them. The other gentleman was Mr. Madison. They were driving on the highway near the tracks, Route 61 up by Hinkley. They saw somebody walking on the tracks. They did not know who it was, but they figured it might be a railroad employee because of the vest he was wearing, the colored vest and the hat and all that. They parked their car immediately, their truck immediately, put on their protective equipment, and ran toward him and yelled at him to get off the tracks. They were trying to save him because they didn't really know what was going on. As they approached, they found out that it was Mr. Kudyk. When they got there, Mr. Kudyk's explanation to them was, this is the safest place to walk. He didn't think that the ballast on the side of the track was safe enough. The two trainmasters, Jabe and Madison, said to him, we don't take any exception to it. That's the language they use, exception. We don't take any exception to it. It's fine. And then Mr. Kudyk began to be apologetic. When they explained to him, he didn't even realize apparently what rule he had violated. That's what he said. Then he became apologetic and said, okay, I've only got a year left. Give me a break, things like that. The important part was Mr. Kudyk was not performing a duty when he was walking down the middle of the tracks. His explanation is, I was picking up a device called a FRED. And a FRED is some kind of a device that goes on the rear end of a car and it's a connection kind of thing. And they had taken off this FRED and left it by the side of the tracks three to four car lengths up the tracks. Car length, ballpark figure, 25 feet. That's what we're talking about. There's no dispute about how far down the tracks he walked. Mr. Kudyk's explanation when he was discovered by the two trainmasters is, I had to pick up the FRED, and so that's why I'm walking in the middle of the tracks. That was not good enough. That excuse was blown away at the hearing because there was no reason for him to be walking in the middle of the tracks. Even if he had gone to pick up the FRED, at most he would be entitled to cross over the tracks to get to the ballast, two sets of tracks. Yes, Your Honor. Did you call it a spread? A FRED, F-R-E-D. A FRED, okay. Yes. Please don't ask me to tell you what that stands for. I didn't hear that question. Okay, yes. When he's picking up the FRED, he's performing a duty. He is performing a duty at that point, but the question then is, where does he walk after that? If he had merely crossed the track, which we would agree, he would be entitled to pick up the FRED on one side of the track, cross the track, and then walk on the ballast in between the two sets of tracks. He chose instead to pick up the FRED and just meander down the center of the tracks. Well, what if he had taken all the proper precautionary things, called ahead, put brakes on, whatever they are, and determined that it was safer to walk down the middle, having done all those precautions? Would he then not be violating the rule?  I mean, first of all, there's a reason why this thing called following the track is listed among what's called the eight deadly decisions or the eight deadlies as they're called in the railroad. You just don't do it. Now, when we were kids, 9, 10, 11 years old, probably a lot of us went to the railroad tracks and played on the tracks. I know I did. But you don't do that at the railroad. I understand that, Mr. Conner. Let me ask it this way. I think he's now asserting that he took all those safety precautions and that he determined that it was safer to walk down the middle having taken those safety precautions. Was that information ever known to Jabe or Ebel or anybody else? It was not known to them at the time that they found him on the tracks. The way it works is this. They found him there. He was committing a violation. Mr. Madison goes back. How about at the time they actually make the decision? Yes, he brought this all up at the investigative hearing, and that was rejected by the company because they did not find that he had to be walking down the tracks. He was performing no duty, and there wasn't sufficient evidence, as far as the railroad was concerned, at the investigative hearing that he had actually established all the protection that he said he did. There was a dispute about whether or not all that protection was in place. All of this is something that Mr. Kudyk was creating or presenting for his defense, which he was entitled to do at his due process hearing. I would emphasize that they get a pretty robust due process hearing, even though the hearing they're not sworn in under oath. They testify. It's transcribed. They bring witnesses. They can compel people to show up. They have their union representatives. This is not your perfunctory tell-me-all-about-what-happened kind of thing. But the essence was the railroad determined that there wasn't a good enough reason for him to be walking on the tracks. He had no duty that compelled him to do that or required him to do that in the language of the TYNE rules. I think it's 13.31, something like that. And there was insufficient evidence that he really had established all the protection that he claimed to have established. Was that? Was it at that point, after the investigation, that they offered him what may be said a settlement of some kind? Yes. In fact, they... I'm wondering. Yes. I know the settlement is not usually a matter that goes into the merits at all. That's different. But in this case, does that show that the railroad was concerned about whether they could really show a violation if it went to court? No. The settlement was, first of all, the settlement was under the collective bargaining agreement. It was a grievance settlement. The union grieved it for him. That's part and parcel of the investigation. I think that the real reason for the settlement was simply out of compassion. Mr. Kudyk was about a 37-plus-year employee of the railroad. He was within a year of retirement. And the deal that was brokered for him with the railroad allowed him to come back and what they call mark for service for a couple of weeks and do it in a location where he wouldn't get into trouble, I think in the yard. And then the deal was he would officially retire either at the end of May or the end of June 2011, which he did. He accepted that deal. He did retire. That protected him. The reason to allow him to do that was to protect his railroad retirement pension and the lifetime health benefits that go along with that. Did you say he accepted it or I thought he rejected it? He rejected it prior to the investigative hearing, but about six months later in April of 2011, he did accept it, and that was the deal. He did retire. With his benefits? With his benefits. So this is saying he wants something extra now. Indeed, Your Honor. In fact, the OSHA complaint under the FRSA was filed approximately a month before the settlement was concluded with the union, and nobody knew about it until after the settlement was concluded. We didn't get that charge from OSHA for quite a while. The settlement must not have included a release. No. Or we wouldn't be here. Correct. Well, and that's another issue, but, no, it did not. It was a settlement of the grievance and allowed him to gracefully exit the company, which, you know, after 30-some years, the railroad wanted to do that. They just weren't ready to put him back to work in a place where he'd get into trouble again. Thank you. So are there other questions? I have one point to address perhaps, but are there other questions that the court would like to ask? Okay. One final point, and that is I think that we're ‑‑ I think the court, I think it's clear, Burlington Northern not only met its burden on defense to establish by clear and convincing evidence that it would have taken the same action against Mr. Kudik. The important thing in this case, there is no evidence to the contrary that it would not. The evidence is uncontroverted. This gentleman would have been fired for, would have been discharged for the second violation. And the difficulty that we have with the argument being put forward by the plaintiff appellant in this case is that to accept that argument would almost ‑‑ would make it virtually impossible for any railroad to dismiss anyone who commits misconduct, which is unprotected, and would lead inevitably, I think, to virtually every dismissal, you know, coming to court forever. It's just not a practical way of doing it. The railroad investigated this carefully. They gave him all the process that he was due, every opportunity to explain himself. They found those explanations wanting. And they did, and the district court's opinion was very well reasoned and is correct, and we request that the court affirm it. Thank you. Thank you. Mr. Bowman, do you have some comments? No, he is outside. I think we understand the issues. They've been thoroughly briefed and argued. We'll take it under advisement. We can go to another one.